ROGERS, Justice.
 

 This is a mandamus proceeding in which William F. Martin, the relator, seeks to be reinstated as an employee of the Department of State Police and to obtain a judgment for his salary at the rate of $175 per month from August 5, 1941, until such time as he is restored to his employment.
 

 During the year 1928, the relator was employed by the Louisiana Highway Commission as a highway patrolman. He retained this position until the Department of State Police was created by Act No. 94 of 1936, when he was transferred to and commissioned by the Department as a patrolman. On or about June 13, 1940, he was promoted to the position of Sergeant and commissioned as such. He remained in
 
 *235
 
 that position until August 5, 1941, when he claims he was summarily dismissed from the service by Steve Alford, Superintendent of the Department. At that time relator was serving as a Desk Sergeant at the State Police Headquarters, in the City of Baton Rouge, and his salary as such was $175 per month.
 

 Alleging that he yas illegally dismissed from his employment, without written charges having been preferred against him, without hearing, and without complying with the provisions of Act No. 94 of 1936, as amended, relator brought this suit for mandamus against Steve Alford, Superintendent of the Department of State Police, Ludlow B. Baynard, State Auditor, and Andrew P. Tugwell, State Treasurer. The mandamus was sought against the State Auditor to compel him to issue relator’s salary warrant or warrants to the State Treasurer, and against the latter officer to compel him to honor the warrants.
 

 The State Auditor and the State Treasurer filed exceptions of misjoinder and no right or cause of action, and, with reservation of the exceptions, filed their answer. In their answer, the Auditor and the Treasurer denied the .right of the relator to enforce his demand as against them, and they specially pleaded laches and estoppel by laches on the part of the relator.
 

 No exception was filed by the Superintendent of the Department of State Police. He answered, denying relator’s petition, and specially pleaded laches and estoppel by laches on the part of relator.
 

 After argument by counsel, the exceptions filed by the State Auditor and the State Treasurer were referred to the merits. The case was then heard and submitted on the merits, resulting in a judgment in favor of the relator as prayed for.. All the respondents have appealed from the judgment.
 

 The exceptions filed by the State Auditor and the State Treasurer appear to be well founded, but it is, not important to determine that question since we have concluded that, on the merits, plaintiff’s case can not be maintained.
 

 The facts, as disclosed by the record, are that relator was serving as a patrolman in the Department of State Police for some years prior to the time the respondent Alford became superintendent of the department. On June 13, 1940, relator was made a sergeant by Alford, and he was discharging the duties of desk sergeant on August 5, 1941. On that date relator was summoned to the office of the superintendent where a discussion took place between them, resulting in the severance of relator’s employment with the Department of State Police.
 

 'There is a serious dispute as to whether the relator was discharged by the superintendent, or whether he voluntarily resigned from the police force. Relator insists that he was summarily discharged, but, on the other hand, Superintendent Alford insists that relator resigned.
 

 The discussion that took place between the relator and the superintendent occurred between themselves and behind closed doors. There were no other persons present and therefore no witnesses, other than the parties themselves, who could testify
 
 *237
 
 as to what was actually said on that occasion. There is no written evidence of what transpired for the reason that while relator did not submit his resignation in writing, neither did the superintendent issue any written order or notice discharging relator.
 

 It is also a fact that after the discussion in the superintendent’s office, relator left the Department of State Police and, without making any legal or other protest, without -asking for a copy of written charges against him, and without asking for a hearing, waited eight months before bringing this mandamus suit for his reinstatement and the recovery of his back salary.
 

 Testifying in his own behalf, relator stated that on August 5, 1941, he was on the afternoon shift from twelve to four o’clock, sitting at his desk, when Superintendent Alford passed his office; that Alford told him to come into his office; that he followed Alford into his office and that Alford then told him to turn in his uniform; that he asked Alford if he wanted him to finish the day, “and he (Alford) said, ‘No’ that he didn’t want him to finish a damn thing; so I got my hat and walked off.” Later in his testimony, in answer to a question of his counsel, relator stated that Alford asked him if he would sign a resignation which he refused to do. On cross-examination, on being interrogated as to what took place between him and Superintendent Alford, the witness stated that the only thing the superintendent said, in addition to demanding that he turn in his uniform, was “that some of the politicians didn’t want hirri on the job, and that they had been trying to get rid of me.”
 

 Superintendent Alford, who was called for cross-examination by relator and also testified on his behalf, flatly contradicted the testimony given by relator. He expressly denied the statement of relator that he told him the politicians wanted to get rid of him. In answer to a question relative to the connection, if any, that politicians had with the matter, the witness stated: “All the politicians I know were trying to help him. All my political friends have been trying to help him.”
 

 Superintendent Alford’s version of the incident resulting in relator’s severing his connection with the Department of State Police, as shown by his testimony, is as follows: That on the evening of August 4th, 1941, he ascertained that relator was absent from his post; that relator had taken a patrol car and was away for a period of an hour and forty-five minutes, during which time “he had gone down the street to a house that he frequently went to and he stayed there an hour and forty-five minutes.” The witness further testified that on the evening of August 5, 1941, he called relator into his office, “and said, ‘Bill, I have had plenty of complaints in regard to your conduct — sleeping on duty, going away and leaving your post, and you are responsible for this office for'eight hours. You left your post last night and took the patrol car and tied up the men left in the office.’ He said he did. I asked him if he had done that, and he said that he' had. I said, “I have told you time and again that the time would come when I would have to do something about it. Therefore, I am going to prefer charges against you in regard to that.’ He said,
 
 *239
 
 ‘That will not be necessary. I will resign. I will quit.’ And he walked out of the office and did not stop at the desk — he just kept going. There was nothing said about him turning in his clothes at any time by him. He did not stop at the office. I followed him out.” The witness further stated that, by charges, he meant charges before the Police Board.
 

 ■ In weighing the testimony of relator and Superintendent Alford from the standpoint of its reasonableness or unreasonableness, the testimony of the superintendent appears to be the more reasonable and in accordance with the facts. It is difficult to believe that the superintendent called relator into his office and discharged him from the service by merely demanding that he turn in his equipment without assigning any reason for his action. The statement of the superintendent appears to be the authentic narrative of the incident. It is certainly more reasonable to believe that the superintendent summoned relator to his office to inform him that complaints of gross neglect of duty had been made against him; to apprise him of the nature of the complaints and the charges involved therein, and to notify relator that it was incumbent upon him as superintendent to bring the charges against relator before the trial board of the Department of State Police; and that relator voluntarily resigned from the force in order to prevent charges on neglect of duty being presented to and heard by the department.
 

 Apart from this, the version as given by Superintendent Alford finds ample corroboration by other direct and circumstantial evidence and by the conduct of' relator. Thus, on August 9, 1941, relator accepted from the Department of the State Police $29.17 in full settlement of his salary from August 1, 1941, to August 5, 1941, calculated on the basis of $175 per month, and on September 26, 1941,- relator demanded and received from the State Police Retirement Fund $194.85, representing the amount contributed by him during the years of his services with the department. These contributions under the law are withdraw-able only when an employee dies or resigns. Section 3, Act No. 293 of 1938. Furthermore, relator surrendered his credentials and turned in his uniform and other equipment to Sergeant Altmeyer of the Department of State Police.
 

 After his interview with the superintendent, instead of relator returning to his desk and continuing with his duties, which he had a perfect right to do until written charges had been preferred against him, under section 9 of Act No. 94 of 1936, as amended and reenacted by Act No. 57 of 1938, relator simply walked off, turned in his uniform and equipment, accepted pay for only five days’ services, withdrew the full amount of his contribution to the pension fund, and sought work elsewhere.
 

 Presumptions from a man’s conduct operate in the nature of admissions, for, as against himself, it is presumed that a man’s actions and representations correspond with the truth. Relator, as a police officer of many years’ experience, presumably was well acquainted with his rights which he would have insisted upon if he were innocent of any wrongdoing.
 

 
 *241
 
 Relator’s actions in leaving his post, surrendering his credentials and equipment, drawing his pay and his accrued pension fund, and seeking work elsewhere, without protest, or demanding a copy of written ■charges and a hearing thereon before the police trial board, establishes by a preponderance of the evidence that he voluntarily left the department of his own volition and not as a result of an illegal discharge for no cause at all, as he, in effect, claims. Hence, there was no necessity for Superintendent Alford to follow the method prescribed by section 9 of Act No. 94 of 1936, as amended and reenacted by Act No. 57 of 1938, in order to remove relator from his employment.
 

 There is no law that forbids an employee of the Department of State Police to verbally resign and walk off as Superintendent Alford testifies relator did, and as the evidence shows he did, and there is no way of preventing him from doing so without first submitting a written resignation. Moreover, if relator were illegally discharged as he claims, availing himself of the provisions of Act No. 94 of 1936, as ■amended and reenacted by Act No. 57 of 1938, he could have demanded that written charges be preferred against him and served upon him and could have demanded a hearing on the charges within five days after receiving them. But relator never demanded the written charges or for a hearing thereon. His failure to resort to the remedy available to him, his failure to protest against his alleged illegal discharge, his voluntary leaving his employment turning in his equipment, accepting only a small portion of his salary and withdrawing the amount of his accrued pension, and waiting more than eight months before bringing this suit constitutes an acquiescence in his discharge, if he were actually discharged.
 

 Relator waited eight months and eight days before filing the present suit. He made some attempt to show that his failure to institute the suit during that interval resulted from the fact that he was negotiating with Superintendent Alford, personally and through certain friends, to be reinstated in his former position. The only action taken by relator personally looking to his reinstatement was when he, on or about September 1, 1941, sought out Superintendent Alford in a cafeteria, where he was drinking coffee, and discussed the matter with Him, but without obtaining any relief. Failing to secure reinstatement by his own efforts, relator sought the assistance of certain officeholders and friends to assist him in obtaining reemployment. In compliance with relator’s request, two personal and political friends of his and Superintendent Alford called upon the superintendent to intercede with him in relator’s behalf. The mission of these gentlemen, as shown by their testimony, was not to obtain relator’s reinstatement on the ground that he had been illegally discharged, but was solely for the purpose of obtaining his employment in some capacity with the Department of the State Police. Both testified that they asked Superintendent Alford if there was any chance to put relator back to work and that the superintendent told them that there was not. However, Alford agreed that if the friends of relator who spoke to him were able to find employment for
 
 *243
 
 relator as a guard or watchman in one of the local industrial plants, he would issue a commission to relator as such. But the proposed employment did not materialize and Alford was not called upon to make good his agreement.
 

 Neither of the persons who interceded for relator was connected with or had any authority in the State Police. Their testimony clearly brings out the fact that at no time was relator deceived or misled by any promises made to him that he would be reinstated by Superintendent Alford, or any other person representing the Department of State Police. From the beginning Alford made it plain to relator that he would not reinstate or reemploy him, and the position taken by him in this respect was confirmed and communicated to relator as a result of the several conferences had on the subject by the friends of the relator with the superintendent. From which it appears that relator’s delay in bringing this suit can not be attributed to any hope or promise of reinstatement held out to him by any person having authority to do so.
 

 In these circumstances, relator is guilty of such laches as must defeat his right to the relief sought, if any such right existed, which we do not think is the case.
 

 It is well settled that the right of a public official or employee to be reinstated may be lost by laches or unreasonable delay in making application for that purpose.
 

 In United States ex rel. Arant v. Lane, 249 U.S. 367, 39 S.Ct. 293, 294, 63 L.Ed. 650, the Supreme Court of the United States considered a matter involving the delay of a public official in seeking reinstatement and said: “When a public official is unlawfully removed from office, whether from disregard of the law by his superior or from mistake as to the facts of his case, obvious considerations of public, policy make it of first importance that he should promptly take the action requisite to effectively assert his rights, to the end. that if his contention be justified the government service may be disturbed as little-as possible and that two salaries shall not be paid for a single service.”
 

 This Court has similarly said, in State ex rel. Skelly v. Board of Commissioners, 159 La. 465, 105 So. 510, 511: “We believe that plaintiff was harshly and unjustly dealt with, but we realize that in the absence of prompt action on his part to-correct the evil, the taxpaying public have an interest that is paramount to that of plaintiff, and such a vital interest as the-courts of the land cannot ignore.”
 

 The necessity for prompt action in such cases has been recognized many times by this Court and by the courts of other states and examples of the application of the rule are numerous. Notable among, them are: State ex rel. McCabe v. Police Board of New Orleans, 107 La. 162, 31 So. 662; Crais v. City of New Orleans, 172 La. 931, 136 So. 7; State ex rel. Koehl v. Sewerage and Water Board, 179 La. 117, 153 So. 533; State ex rel. Lutz v. Sewerage and Water Board, 179 La. 742, 155 So. 10; State ex rel. Calamari v. Orleans Parish School Board, 189 La. 488,
 
 *245
 
 179 So. 830; State ex rel. McMurray v. Orleans Parish School Board, 189 La. 502, 179 So. 834; Stone v. Board of Prison Com’rs, 164 Ky. 640, 176 S.W. 39; People ex rel. Connolly v. Board of Education, 114 App.Div. 1, 99 N.Y.S. 737; Clark v. City of Chicago, 233 Ill. 113, 84 N.E. 170; People ex rel. Reith v. Polk, 138 App.Div. 497, 122 N.Y.S. 1048; People v. Justices, etc., 78 Hun 334, 29 N.Y.S. 157.
 

 For the reasons assigned, the judgment appealed from is annulled, and-it is now ordered that there be judgment in favor of the respondents, Steve Alford, Superintendent Department of State Police and Director of the Department of Public Safety of the State of Louisiana; Ludlow B. Baynard, Auditor of the State of Louisiana, and Andrew P. Tugwell, Treasurer of the State of Louisiana, and against William F. Martin, the relator, recalling the writ of mandamus herein issued, rejecting relator’s demands and dismissing his suit, at his cost.
 

 ODOM, J., absent.